**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

JOYCE ANN WATTS,

      Plaintiff,

v.                                   CIVIL ACTION NO. 3:20-cv-00624

KILOLO KIJAKAZI,[1] Acting
Commissioner of Social Security,

      Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

      Plaintiff Joyce Ann Watts ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on September 23, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.) Presently pending before this Court are Claimant's Brief in Support of Judgment on the Pleadings (ECF No. 15) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 16).

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d). *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 15), **GRANT** the Commissioner's request to affirm her decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from this Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 44 years old at the time of her alleged disability onset date and 47 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 294.)[2] She is a high school graduate. (*Id*. at 287.) Most recently, she worked as a nursing assistant, and she has also been employed as a home health aide, a deli assistant, and a cashier. (*Id*.) Claimant alleges that she became disabled on April 1, 2017, due to a Morton's neuroma and neuropathy in her right foot, "Allergic reaction to stitches," a hernia, high blood pressure, diabetes, anxiety, and "Breathing Problems." (*Id*. at 286, 294.)

Claimant filed her applications for benefits on December 7, 2017. (*Id*. at 15, 242–69.) Her claims were initially denied on May 9, 2018, and again upon reconsideration on September 20, 2018. (*Id*. at 76–101, 151–66.) Thereafter, on October 4, 2018, Claimant filed a written request for hearing. (*Id*. at 167–71.) An administrative hearing was held before an ALJ on July 30, 2019, in Huntington, West Virginia, with the ALJ appearing from Baltimore, Maryland. (*Id*. at 31–73.) On October 30, 2019, the ALJ rendered an unfavorable decision. (*Id*. at 12–30.) Claimant then sought review of the ALJ's decision by the Appeals Council on December 23, 2019. (*Id*. at 239–41.) The Appeals Council

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 14.

denied Claimant's request for review on September 2, 2020, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id*. at 1–6.)

Claimant timely brought the present action on September 22, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 13) and a transcript of the administrative proceedings (ECF No. 14). Claimant subsequently filed her Brief in Support of Judgment on the Pleadings (ECF No. 15), and in response, the Commissioner filed her Brief in Support of Defendant's Decision (ECF No. 16). As such, this matter is fully briefed and ready for resolution.

### B. *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

#### 1. *Treatment for Severe Physical Impairments During Relevant Period*

Several months before her alleged onset date, on November 9, 2016, Claimant presented to a podiatrist and complained of right foot pain. (*Id*. at 409.) She was diagnosed with a Morton's neuroma, and the podiatrist recommended injections. (*Id*. at 410.) After the injections did not resolve Claimant's pain, her podiatrist recommended a surgical excision of the Morton's neuroma. (*Id*. at 404–05.) The procedure was performed on January 26, 2017. (*Id*. at 394–95.) Her wound later became infected, and on March 28, 2017, it was surgically drained. (*Id*. at 378–79.) On April 4, 2017, three days after Claimant's alleged onset date, her podiatrist noted that the "incision is healing very nicely." (*Id*. at 367.) He remarked that the incision "is completely closed" and that Claimant "is doing well" on April 19, 2017. (*Id*. at 365.)

On May 24, 2017, Claimant presented to her primary care physician and reported that she stopped using one of her diabetes medications due to its side effects, but her blood sugar was "overall okay." (*Id.* at 431.) The physician noted that Claimant's medication regimen had resulted in "markedly improved control" of her diabetes. (*Id.* at 438.) She discussed medications for diabetic neuropathy with Claimant, but Claimant indicated that she "[w]ants to wait for now." (*Id.*) A physical examination was normal aside from swelling in Claimant's left lower extremity and hands. (*Id.* at 436.)

Several months later, on November 29, 2017, Claimant returned to her primary care physician and reported that she was "having a lot of pain [in her] hands, legs and knees." (*Id.* at 417.) The physician noted that Claimant's joint symptoms were "likely [osteoarthritis]." (*Id.* at 426.) She also remarked that Claimant's diabetes was less well controlled since she had stopped using one of her medications but directed her to increase another medication. (*Id.* at 425.) Upon physical examination, the physician observed that Claimant's right foot was "[n]otably tender to palpation" and "[n]umb to light touch." (*Id.* at 424.) Claimant addressed this with her podiatrist at her December 5, 2017 appointment, when she reported "some increased pain" in her right foot in the same area as her previous Morton's neuroma. (*Id.* at 359.) The podiatrist remarked, "It is difficult to determine how much this may be coming from neuropathy versus possibility of recurrent neuroma." (*Id.*) He prescribed pain medication. (*Id.* at 359–60.)

Claimant next presented to her primary care physician on February 7, 2018, following a hysterectomy that "[w]ent well." (*Id.* at 798.) She reported that her vision had been "worse lately and she knows [it is] related to her poor sugar control." (*Id.*) However, she declined a "dietitian referral" for her diabetes. (*Id.*) The physician noted that Claimant had "worsening control" of her diabetes and increased one of her

medications.  (*Id.*)  When Claimant returned to her podiatrist several days later, on February 12, 2018, she continued to complain of pain and numbness in her right foot.  (*Id.* at 714.)  Upon physical examination, the podiatrist observed "pain to palpation of the third interspace" that "was increased on medial to lateral compression of the forefoot." (*Id.*)  He also noted "some generalized burning sensations to the first 3 toes in particular of the right foot."  (*Id.*)  The podiatrist diagnosed Claimant with "Diabetic peripheral neuropathy, primarily involving the right foot with possible Morton neuroma of the third interspace" and prescribed "metatarsal pads" and a new medication.  (*Id.*)

By her next appointment with her podiatrist on March 20, 2018, Claimant's right foot pain had not improved, so he gave her a pain injection.  (*Id.* at 712.)  At her May 1, 2018 appointment, Claimant reported "complete relief of all of her forefoot symptoms for about 4 to 6 hours after the injection and slowly her pain has returned."  (*Id.* at 710.) Upon physical examination, the podiatrist observed "pain only to palpation of the right third interspace."  (*Id.*)  He diagnosed her with another Morton's neuroma and recommended that it be surgically removed, but he told her at her September 25, 2018 and February 19, 2019 appointments that he did not recommend surgery until Claimant's diabetes was under control.  (*Id.* at 710, 815, 819.)

In the meantime, on March 8, 2018, Claimant presented to a urologic oncologist for treatment of her umbilical hernia, and he scheduled a hernia repair surgery for April 2, 2018.  (*Id.* at 976.)  However, when imaging revealed a cancerous renal mass, the oncologist scheduled Claimant for a right partial nephrectomy, which was performed on July 16, 2018.  (*Id.* at 977–79; *see id.* at 933.)  Claimant returned to her oncologist on September 6, 2018, and stated that "[s]he would like to have her surgery for ventral hernia performed as soon as possible."  (*Id.* at 979.)  The surgery was performed on November

5

5, 2018, and at a follow-up appointment on January 29, 2019, the oncologist noted that Claimant "is doing well and no signs of recurrence." (*Id.* at 980; *see id.* at 995–97.) Imaging of Claimant's right kidney performed on January 29, 2019, was normal. (*Id.* at 981–82.)

On September 12, 2018, Claimant presented to the emergency department at a local hospital, complaining of left knee pain. (*Id.* at 2266.) A physical examination revealed no redness or swelling, "point tenderness at the left quadriceps tendon area," and "good pedal pulses," and it was noted that Claimant denied numbness. (*Id.* at 2268 (emphasis deleted).) Imaging of the knee showed "[m]ild arthritic changes." (*Id.* at 2269.) Claimant was diagnosed with tendonitis in her left quadricep and mild arthritis in her left knee, but she left the hospital without further treatment. (*Id.* at 2270.) About a month later, on October 10, 2018, she presented to her primary care physician and reported that she was "[n]ot sleeping well at all" and had "lots of leg [movement]." (*Id.* at 1154.) She also complained of pain in her right foot. (*Id.* at 1153.) Claimant's physician prescribed medication for restless leg syndrome and increased the dosage of one of her diabetes medications. (*Id.* at 1160.)

When Claimant returned to her primary care physician on January 9, 2019, she complained of "issues with chest pain and some numbness in left arm on occasion" since having her hernia surgery several months prior, as well as "[e]xcessive joint pain in [her] right hand, left hip, both knees, [and] lower back" and vertigo. (*Id.* at 1128.) A physical examination was normal aside from edema in her lower extremities and tenderness and numbness in her right foot. (*Id.* at 1133–34.) The physician also observed some scar tissue around Claimant's bellybutton. (*Id.* at 1133.) She noted that Claimant had "worsening control" of her diabetes and directed her to increase the dosage of one of her

6

medications and counseled her on a proper diet. (*Id.* at 1136.) She instructed Claimant to use over-the-counter pain relievers for her joint pain. (*Id.* at 1137.)

Claimant presented to her primary care physician on June 3, 2019, and reported "really bad joint pain" and lower extremity swelling. (*Id.* at 1097.) The physician observed edema in both of Claimant's lower extremities upon physical examination. (*Id.* at 1103.) She noted that Claimant's medication was "extremely helpful" in treating her diabetes but encouraged her to lose weight and improve her diet. (*Id.* at 1105.)

2. *Treatment for Mental Impairments During Relevant Period*

On May 24, 2017, about two months past her alleged onset date, Claimant presented to her primary care physician and reported experiencing panic attacks once or twice a week. (*Id.* at 431.) A psychiatric examination was normal that day. (*Id.* at 436.) The primary care physician instructed Claimant to continue her medications, which she described as "helpful," and to rely on cognitive behavioral therapy techniques "as first line." (*Id.* at 439.)

When Claimant next returned to her primary care physician on November 29, 2017, she reported that her "[p]anic attacks have worsened over the [h]olidays." (*Id.* at 417.) The physician observed that Claimant was "[n]ot crying but clearly stressed," although she had "[g]ood eye contact," normal judgment and insight, intact recent and remote memory, and was fully oriented. (*Id.* at 424.) She also observed that Claimant was "[n]ot crying but clearly stressed" at her February 7, 2018 appointment, but she noted that Claimant was "doing well" with her depression and anxiety. (*Id.* at 804, 807.)

However, at her next appointment with her primary care physician on May 23, 2018, Claimant reported that she "is having more issues with anxiety" due to personal conflicts with her daughter's boyfriend. (*Id.* at 788.) A psychiatric examination was

largely normal.  (*Id.* at 794.)  The physician modified Claimant's medication regimen.  (*Id.* at 796.)

On October 10, 2018, Claimant presented to her primary care physician and reported difficulty sleeping.  (*Id.* at 1154.)  She also related that she was still having panic attacks.  (*Id.*)  The physician believed that Claimant's insomnia was caused in part by "[p]sychogenic stress" and prescribed a sedative.  (*Id.* at 1160.)

When she presented to her primary care physician on January 9, 2019, Claimant reported that she "still feels stressed" and was "[i]n pain all [the] time."  (*Id.* at 1128.)  The physician noted that she "[b]egan crying" during the appointment.  (*Id.*)  A psychiatric examination was normal, although the physician remarked that Claimant was "[d]oing better than last visit though still clearly stressed."  (*Id.* at 1134.)  She directed Claimant to increase the dosage of one of her medications and counseled her on cognitive behavioral therapy techniques.  (*Id.* at 1136.)

At her June 3, 2019 appointment with her primary care physician, Claimant complained of "issues with anxiety" and "trouble concentrating" because she was "stressed on taking care of everybody else."  (*Id.* at 1097–98.)  She also related that she was having "[f]ull blown panic attacks" two to three times per week and that her medication was "not strong enough any more [sic]."  (*Id.* at 1098.)  Upon psychiatric examination, the physician observed that Claimant was "[v]ery anxious," but she had normal judgment and insight, was fully oriented, had intact recent and remote memory, maintained "good eye contact," and was "[r]easonable and fully active in medical plan formulation."  (*Id.* at 1103–04.)  Claimant was prescribed a new medication, and her physician recommended that she seek counseling.  (*Id.* at 1105.)

8

*3. Vocational Expert Hearing Testimony*

During the administrative hearing, the ALJ heard testimony from a vocational expert ("VE"). (*Id.* at 66–71.) She first asked the VE to classify Claimant's past work, and the VE answered that Claimant previously worked as a certified nursing assistant at the very heavy exertional level, although the job was classified at the medium exertional level. (*Id.* at 66.)

The ALJ then asked the VE to imagine a hypothetical individual with Claimant's age, education, and work experience who could lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, or walk for six hours in an eight-hour workday; occasionally climb stairs, balance, stoop, kneel, and crouch but never crawl or climb ladders; should avoid concentrated exposure to bright light, temperature extremes, vibration, and humidity and all exposure to hazards; and would be "limited to low stress work, defined as occasional decision-making and occasional changes in work setting." (*Id.* at 66–67.) The VE testified that such an individual could not perform Claimant's past relevant work but could work as a cashier, mail sorter, or merchandise marker. (*Id.* at 67–68.)

Next, the ALJ asked the VE to imagine another hypothetical individual with the same limitations as the first, except she would "require a sit/stand option where she can change positions between sitting and standing every half hour as needed throughout the day while remaining on task." (*Id.* at 68.) The ALJ further elaborated that the second hypothetical individual "would have the option to sit for 30 [minutes] or to stand for 30 [minutes] and it would be in their discretion. In other words, anywhere between just standing up to stretch, to standing for 30 minutes." (*Id.*) The VE testified that such an individual could, like the first hypothetical individual, work as a cashier, mail sorter, or

merchandise marker, but the number of available positions for each job would be reduced. (*Id*. at 68–69.)

The ALJ went on to ask the VE about "the customary tolerances that a typical employer would have as to an employee having unexcused or unscheduled absences." (*Id.* at 69.) The VE explained that "it's approximately eight days per year, but it varies significantly by sector." (*Id.*) She remarked that employees in the industrial sector "cannot miss any time during an introductory or probationary period," which is "typically up to 90 days," but could miss "an upper threshold of 1 day per month thereafter." (*Id.*) She continued, "In other sectors, such as the government sector, the healthcare sector, the service sector, in office environments, an individual could miss one day per month during that same introductory period of 90 days with an upper threshold of one and a half days per month thereafter." (*Id.*) The ALJ also asked the VE about "the customary number and length of breaks that a typical employer permits during the workday." (*Id.*) The VE answered that breaks are "sometimes prescribed by local wage and hour laws, but typically an individual has a 15-minute break after the first 2 hours of the first part of their shift, a meal break 2 hours after that that could last anywhere from 30 minutes to an hour depending upon the length of the workday, and then after the additional 2 hours, another 15-minute break in the second half of the shift." (*Id*. at 69–70.) She asked the VE "how much off task time is typically permitted in additional [sic] to regularly scheduled breaks," and the VE testified that "it would be no greater than 15% in order to maintain employment in the national economy." (*Id*. at 70.)

Lastly, the ALJ asked the VE if her testimony was consistent with the *Dictionary of Occupational Titles* and the Selected Characteristics of Occupations, and she responded that it was, except neither publication addresses bright lights, low stress work,

a sit/stand option, breaks, or absenteeism. (*Id.*) The VE explained that her answers with regard to those issues were "based on [her] education, professional training and experience." (*Id.*) The ALJ asked the VE how many years of experience she had, and she testified that she had provided expert witness testimony for five years and had worked in vocational rehabilitation for thirty-five years. (*Id.*)

The ALJ also gave Claimant's counsel an opportunity to examine the VE. (*Id.* at 70–71.) He first asked her how her testimony would be affected "if [the hypothetical] individual had to elevate their foot due to swelling 3 to 4 times, 15 minutes at a time." (*Id.* at 71.) The VE testified that "[i]t wouldn't work for the cashier" or in a retail environment, but a mail sorter or merchandise marker, who would be working in a sitting position, could use "a small footstool" to elevate her foot "six to eight inches." (*Id.*) Claimant's counsel asked about an individual who "had to sit down and elevate their foot . . . to stick their foot straight out," and the VE testified, "that would be work preclusive . . . [i]n any of these jobs." (*Id.*)

## *C. Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4).  "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The ALJ gleans this information from the available medical evidence.  *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'"  *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20

C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a [VE] responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through June 30, 2019. (Tr. at 17.) She further determined that Claimant had not engaged in substantial

gainful activity since the alleged onset of her disability. (*Id.*) She found that Claimant's degenerative joint disease; right foot neuroma, status-post excision; obstructive sleep apnea; diabetes mellitus; obesity; umbilical hernia; right renal mass; and generalized anxiety disorder constituted "severe" impairments. (*Id.*) However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 18–20.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform light work . . . except [she] can lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six of eight hours; and sit for six of eight hours." (*Id.* at 20.) She further found that Claimant "can occasionally climb stairs, balance, stoop, kneel, crouch, and crawl, but cannot climb ladders," "requires the option to change positions between sitting and standing every half hour as needed throughout the day while remaining on task," and "cannot have concentrated exposure to bright light, temperature extremes, wetness, humidity or vibration, and cannot have any exposure to hazards." (*Id.*) Finally, the ALJ found that Claimant "can perform low stress work, which is defined as occasional decisionmaking and occasional changes in the work setting." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was unable to perform her past relevant work. (*Id.* at 23–24.) She noted that Claimant is "a younger individual" with "at least a high school education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.* at 24.) Because the ALJ determined that Claimant was unable to perform the full range of light work, she enlisted a VE to aid in his finding that Claimant is capable of working as a cashier, mail sorter, or merchandise marker. (*Id.* at 24–25.) As a result, the ALJ concluded that

Claimant was not "under a disability . . . from April 1, 2017, through the date of this decision." (*Id.* at 25.)

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted).  "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    ANALYSIS

Claimant argues that the ALJ should have accepted the VE's testimony that an individual who would be absent from work more than one and a half days each month, would be off-task more than fifteen percent of the workday, or would have to sit and elevate her foot would not be able to work.  (ECF No. 15 at 5–6.)  She asks this Court to

reverse the Commissioner's decision and award her benefits or to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 6.) The Commissioner responds that the ALJ's RFC assessment is supported by substantial evidence and that she properly evaluated Claimant's subjective complaints. (ECF No. 16 at 8–13.)

As the Commissioner suggests, Claimant essentially argues that the ALJ should have accepted her subjective complaints about the symptoms she alleges her impairments cause. (*See* ECF No. 15 at 5–6.) As part of the RFC assessment, the ALJ must evaluate a claimant's "statements and symptoms regarding the limitations caused by her impairments." *Linares v. Colvin*, No. 5:14-cv-00120, 2015 WL 4389533, at \*5 (W.D.N.C. July 17, 2015) (citing 20 C.F.R. §§ 404.1529, 416.929; *Craig v. Chater*, 76 F.3d 585, 593–96 (4th Cir. 1996)). To evaluate the disabling effect of an individual's symptoms, including pain, the ALJ first determines whether "objective medical evidence" supports the existence of "a condition reasonably likely to cause the [symptoms] claimed." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006); *see* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). If so, the ALJ then "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to "determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). An individual's subjective complaints about her symptoms are relevant to the latter determination. *See id.* §§ 404.1529(c)(3), 416.929(c)(3).

Put simply, the claimant's symptoms "must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the [symptoms], in the amount and degree, alleged by the claimant." *Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005) (per curiam) (quoting *Craig*, 76

F.3d at 591).  The ALJ is obligated to "assess whether the claimant's subjective symptom statements are consistent with the record as a whole." *Vass v. Berryhill*, No. 7:17-cv-87, 2018 WL 4737236, at *6 n.4 (W.D. Va. June 12, 2018), *adopted by* 2018 WL 4704058 (W.D. Va. Sept. 30, 2018).  The ALJ in this case did so, noting that Claimant "reported difficulties lifting, standing, walking, squatting, reaching, kneeling, climbing stairs, and concentrating."  (Tr. at 21.)  She determined that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but she found that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (*Id.*)  Specifically, the ALJ explained that she limited Claimant "to a range of light work with a sit/stand option due to the combination of degenerative joint disease and recurrent right foot neuroma," and she attributed the sit/stand option to Claimant's hearing testimony "regarding prolonged standing."  (*Id.* at 21, 23.)  With regard to Claimant's mental impairments, the ALJ noted that Claimant "received only routine treatment from her primary care physician," whose treatment records "suggest that her anxiety is poorly controlled," so she explained that she "limited [Claimant] to low stress work due to evidence of poorly controlled anxiety." (*Id.* at 22–23.)  The ALJ also remarked that the opinions of the state-agency consultants were "generally persuasive" and "generally consistent with the evidence submitted at the hearing level."  (*Id.* at 23.)

In other words, the ALJ credited Claimant's subjective complaints to some extent, but she explained why she did not find Claimant to be as limited as she alleges and instead determined that she had the RFC to perform "a reduced range of light work with postural and environmental limitations."  (*Id.*)  Contrary to Claimant's suggestion, "the ALJ labors

under no obligation to accept [her] subjective complaints at face value." *Squires v. Colvin*, No. 1:16-cv-190, 2017 WL 354271, at *5 (M.D.N.C. Jan. 24, 2017) (report and recommendation of magistrate judge) (internal quotation marks omitted); *see Plummer v. Astrue*, No. 5:11-cv-00006-RLV-DSC, 2012 WL 1858844, at *3 (W.D.N.C. May 22, 2012) ("[T]he ALJ is not required to accept a claimant's testimony at face value, but rather is to weigh such testimony with all of the evidence."). Notably, although Claimant asserts that "[t]he objective medical evidence of record supports [her] allegations," she fails to elaborate on precisely what evidence she is referencing. (ECF No. 15 at 5.) The undersigned **FINDS** that the ALJ's evaluation of Claimant's subjective complaints is supported by substantial evidence.

Claimant's argument that the ALJ should have adopted the VE's testimony that an individual who would be absent from work more than one and a half days each month, would be off-task more than fifteen percent of the workday, or would have to sit and elevate her foot would not be able to work fails for the same reason. In determining whether a claimant can perform his past relevant work or adjust to other work at steps four and five of the sequential evaluation process, the ALJ may engage a VE to "offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s)" can perform certain work. 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); *see id*. §§ 404.1560(c), 416.960(c). "In order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of [the] claimant's impairments." *Hines*, 453 F.3d at 566 (quoting *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989)). But the ALJ's hypothetical questions "need only incorporate those limitations

which are credibly established in the record." *Manley v. Berryhill*, No. 2:17-cv-02293, 2018 WL 3423821, at *3 (S.D.W. Va. July 16, 2018) (citing *Walker*, 889 F.2d at 50). "[A]n ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." *Farnsworth v. Astrue*, 604 F. Supp. 2d 828, 858 (N.D.W. Va. 2009) (report and recommendation of magistrate judge) (quoting *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000)).

Again, Claimant has not pointed to any record evidence—aside from her own subjective complaints—indicating that she necessitates the work-preclusive accommodations about which the VE testified. (ECF No. 15 at 5–6.) The undersigned has just explained that the ALJ was justified in partially rejecting those subjective complaints. Further, while the ALJ asked the VE about permissible absences, breaks, and off-task time, she did not include any related limitations for any of her hypothetical individuals. (*See* Tr. at 69–70.) But even if she had, she may present alternative hypotheticals to the VE, "even if they are contradictory," and may "determine after the hearing which hypothetical is supported by the record evidence." *Hart v. Berryhill*, No. 5:18-cv-208-D, 2019 WL 1759741, at *6 (E.D.N.C. Mar. 26, 2019) (quoting *Woodlief v. Berryhill*, No. 5:16-cv-191-FL, 2017 WL 9478528, at *5 (E.D.N.C. Aug. 4, 2017), *adopted by* 2017 WL 4164076 (E.D.N.C. Sept. 20, 2017)). The hypothetical questions presented to the VE are not factual findings and do not bind the ALJ just because they are asked. *Davis v. Apfel*, 162 F.3d 1154 (4th Cir. 1998) (per curiam) (table), 1998 WL 559728, at *2 (stating that hypothetical questions that alternatively included claimant's subjective complaints and did not include them "were entirely proper" because hypothetical not equivalent to "findings of fact"). The undersigned **FINDS** the ALJ's evaluation of

Claimant's subjective complaints and her RFC assessment adequately reflect why she did not rely on the VE's testimony that an individual who would be absent from work more than one and a half days each month, would be off-task more than fifteen percent of the workday, or would have to sit and elevate her foot would not be able to work when concluding that Claimant was not disabled.

*IV.    CONCLUSION*

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 15), **GRANT** the Commissioner's request to affirm her decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985);

*Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: July 27, 2021

Dwane L. Tinsley
United States Magistrate Judge